THE CONSUMERS ELECTRIC LIGHT AND STREET RAILROAD
COMPANY, PLAINTIFF IN ERROR, VS. MARY E. PRYOR,
DEFENDANT IN ERROR.

1. In actions where negligence is the basis of recovery it is
not necessary for the declaration to set out the facts con-
stituting the negligence, but an allegation of sufficient
acts causing injury, coupled with an averment that they
were negligently done will be sufficient.

2. Where the declaration is not drawn upon the theory of the
rule stated in the preceding headnote, but undertakes to
set forth the acts relied on as a cause of action without
stating they were negligently done, it must appear from
the direct averments of the declaration that the acts caus-
ing the injury were per se the result of negligence, or neg-

ligence must appear from a statement of such facts as certainly raise the presumption that the injury was the result of the defendant's negligence.

3. The act of 1891, Chapter 4071, applies to street railroads, but it does not change the rule of pleading negligence to the extent of permitting only an allegation of injury or damage by the running locomotives, cars or other machinery of a defendant company. The statute does not fix arbitrarily liability for an injury done, but under it there is a presumption of negligence arising from injury.

4. The measure of duty under the act of 1891, is all ordinary and reasonable care and diligence, and what will constitute the amount or kind of diligence required will vary under different circumstances as the terms "ordinary" and "reasonable" are relative, and what under some conditions would be ordinary and reasonable diligence might under other conditions amount to even gross negligence.

5. Street cars, regardless of the power by which they are impelled, have no superior rights to other vehicles or pedestrians at regular street crossings, in the absence of a specific legislative grant, but their rights are equal and in common, and impose correlative duties on the respective parties.

6. The employes of a street car company in operating cars have the right to presume that a pedestrian will exercise ordinary and reasonable care and avoid injury from moving cars, and they are not required to stop a car until it becomes evident to a person of ordinary and reasonable care and prudence that the pedestrian has failed in his duty, and has placed or is about to place himself in a perilous situation. The duty, however, devolves upon the employes to keep a vigilant lookout for persons on or approaching the track, especially at street crossings, and when they are discovered to be in danger, or going into danger, on the track, to use every effort consistent with the safety of passengers to avoid injuring such persons.

7. Additional pleas amounting only to the general issues may properly be stricken out on motion.

8. In an action ag'nst a street car company for damages for alleged injury caused in the running of a car, an instruction to the jury is properly refused that seeks to limit the duty of the company's employes to avoid the injury to the time when they became aware of plaintiff's danger without reference to whether they had observed all ordinary and reasonable care before that time to discover the dangerous situation of plaintiff.

9. When the question of negligence arises upon a state of facts on which reasonable men may fairly arrive at different conclusions the fact of negligence can not be determined until one or the other of those conclusions has been drawn by the jury. The inferences to be drawn from the evidence must be certain and uncontrovertible, or they can not be decided by the court.

(TAYLOR, C. J., dissents from the conclusion reached, on the ground of insufficiency of the testimony to support the verdict.)

Writ of Error to the Circuit Court for Hillsborough County.

STATEMENT.

Defendant in error sued plaintiff in error and obtained a judgment for $775 and costs, to which a writ of error was sued out.

The amended declaration upon which the case was tried alleged as follows: That the defendant, on the fifth of March, 1896, in the city of Tampa, county and State aforesaid, said city being then and there a densely populated city, was the owner of and using and operating a certain electric street-railroad, then running upon a cer-

tain public highway there, to-wit: Florida avenue, a certain place in the said public highway, to-wit: at the crossing of said Florida avenue by Zack street, and so being the owner of and using and operating the said railroad as aforesaid, the defendant then and there drove a certain street car along and upon the said street railroad on said Florida avenue up to, upon and at the crossing of the same by Zack street, and it was the duty of the said defendant to so run and operate its said street railroad as not to endanger persons or vehicles traveling upon or crossing any of the streets of said city upon which said street railroad was operated, and when necessary for the protection of persons and vehicles travelling upon, or crossing any of said streets to stop its cars. That the plaintiff, to-wit: on the date aforesaid, with divers, numerous persons (the same constituting a large crowd, who had just come out of the Presbyterian church situated near the intersection of Florida avenue and Zack street aforesaid) was crossing Florida avenue and the track of the said defendant's street railroad laid thereon at a regular crossing thereof (the said plaintiff being accompanied by numerous other persons as aforesaid) while one of the defendant's cars was approaching said crossing on said Florida avenue, and it was then and there the duty of the conductor and motorman running said car to so run and operate the same as to enable the plaintiff, and the other persons who were with her, to safely cross said track, the said conductor and motorman of said car being at such a point on said Florida avenue that they could see the crowd which was crossing the track at least two hundred feet from said crossing, but therein the defendant wholly failed and made default by not stopping said car before reaching said cross-

ing (to enable the plaintiff, together with the crowd of people accompanying her, to cross said track in safety), by means and in consequence of which default and neglect of the defendant aforesaid (by reason of the action of its said employes), the said street car then and there ran and struck with great force and violence upon and against the plaintiff, who was then and there, with all due care and diligence, crossing the track of the said defendant's street railroad at the said regular crossing, at the intersection of Florida avenue and Zack street as aforesaid, and thereby the plaintiff was then and there greatly bruised, hurt and wounded, &c.; further alleging injury and damage for which suit was brought.

A demurrer to the declaration was overruled and defendant filed four pleas as follows: 1st. The general issue. 2nd. That the injury complained of was nothing but an unavoidable accident, for which defendant was in no wise responsible. 3rd. That the injury complained of was caused entirely by the fault, negilgence and carelessness of plaintiff, and by no carelessness, negligence or fault on the part of defendant. 4th. That on the fifth day of March, 1896, defendant had car number 10, with proper appliances and operated by a motorman well skilled in operating electric cars, running from Ybor City into the city of Tampa; that immediately before crossing Zack street, at the crossing of that street and Florida avenue in the city of Tampa, the motorman on said car noticed several persons crossing the street; that immediately he began ringing the gong and to slacken the speed of the car until every one had apparently crossed the track, or stopped for the car to pass; that when the car had run to within about ten or twenty feet of the south crossing of Zack street on Florida avenue the plaintiff started to

go across the track immediately in front of the car; that the moment the motorman saw this, he keeping a lookout in the meantime he applied the brakes and reversed the car, but it was too late, and though the motorman did everything that could be done to stop the car, it struck plaintiff and thereby injured her; that the injury was caused entirely by the carelessness, negligence and fault of plaintiff, and was not done by the fault, negligence or carelessness of defendant. Issue was joined upon the first plea and the others were stricken out on motion of plaintiff.

The testimony bearing upon the negligence or liability of defendant is in substance as follows: Plaintiff testified that she was fifty-five years old and not in very good health at the time of the injury. On the day she was injured she came out of church, hoisted her umbrella, walked to the side walk, heard the car, looked up and saw the car coming just as she was going to cross the track. The car was then opposite Mr. Krause's residence, and it paralyzed her so she could not move. She said "you are not going to run over me," as the car struck her. She threw up her hands and her dress caught on the steps and she tried to move her foot, but the wheel ran over her toes. The car reversed, but did not strike her coming back; that when she first looked up and saw the car it was forty or fifty feet away. The accident occurred at the corner of Zack street and Florida avenue about twelve o'clock on the fifth of March, 1896, in the city of Tampa. There were about fifty persons coming out of the church, some had crossed and some had not, and she thought there were some others crossing when she was. She thought she could have gotten over the track if she had not been paralized with fear. She had crossed the

track at other times when the car was nearer; that she was not in the habit of taking doubtful chances, then, her health not being very good, but she had often taken doubtful chances before that time in crossing before cars; that she could have gotten across the track that time if she had not become paralyzed, and she was a little nervous that morning and gave out. She did not hear them tell her not to cross. Her umbrella was up the way the car was so she could not see it, but looked up when she heard the electric current. Her umbrella was raised and pointing the way the car was coming and when she raised it up she was right on the track. When she saw she could not stop she wanted the car to stop, and at that time she was on the track in the act of crossing it; but she could not say whether she really stepped on the track; she thought the steps struck her; that she blamed the motorman, although she might have said it was her fault; that she remembered seeing the car, but did not realize the danger and did not hear the gong; that she never saw the car until she got to where she was struck, and that she might have moved back when she saw it. She heard the car before she saw it, and when she was crossing the street to cross the track she never looked up or down to see whether the car was coming, and when she discovered the car she was in the act of stepping on the track. The car was to her right and she had her book under one arm and her umbrella down. She had faulty hearing and had to use her eyes, but she heard the electric current and looked in the direction the car was coming and said: "Oh, there is the car." She was not feeling well, was walking slowly and had her umbrella down to protect her eyes; that when she heard the sound and saw the car coming she changed the umbrella into her left

hand and threw up her hand; that she was subject to nervous spells.

W. M. Poage testified for plaintiff that he was in the church at the corner where the accident happened, but did not see it. The services had closed and most of the people had gone out and there were not less than one hundred persons, nor more than one hundred and fifty there. It was a place where people congregate on Sun day, but this was on Thursday and there was an evangelistic service. He had heard that the city had a population of from twenty to twenty-five thousand, and he supposed it might be called the central portion of the city.

A Mr. Wells testified for plaintiff that he was standing at the foot of the door steps of the  church and saw  the accident to plaintiff. A large part of the congregation had come out and there may have been fifty people outside; that he saw Mrs. Pryor when she started to cross the street and the car then must have been half the distance of the street thirty or forty feet away; that Mrs. Pryor passed him as he was standing at the door; that he saw her pass and go towards the car and the track crossing; and that as she passed him he then looked and saw the car coming; that when he first saw the car it was just entering the street on the  other side;  that he watched her walk and go on; when on the track the car struck her; that the car ran past, came to a stop and started back, but was stopped; that it didn't run over her going back; that some men took hold of the car to stop it going back; that he didn't notice Mrs. Pryor do anything after she got on the track; that he couldn't tell about the slackening of the speed; that it happened on Zack street, a regular street crossing; that Mrs. Pryor had just preceded him as the car came into Zack street, but he was on

the church steps, the car coming this way, she going towards it; that she had an umbrella in her hand and went along paying no attention to anything; that there was not any one else crossing the track then; that he didn't hear any one yell, but just as she reached the track the car struck her, but she was walking along paying no attention to anything, and couldn't see for her umbrella; that he couldn't say whether she stopped before the car struck her, if it was so it was only momentarily; that the car wasn't coming as slow as in some parts of the city; didn't remember whether the car was open or closed car; that she fell lengthwise, and the car didn't pass her far if it passed her at all; that he didn't see her motion to the motorman to stop the car; that as far as he knew she never noticed the car at all; that some people had crossed the track and some had not; that he didn't know who was on the track at the time she started to cross, and that the car was about midway of the street when she was approaching the track; that when he said approached the track, he meant from the street; that she never looked towards the car or motioned for the motorman to stop; that the moment she got on the track the car threw her; that he was looking right at her and didn't see her make a motion to the motorman.

Mary E. Taylor testified for plaintiff that she knew the plaintiff about eight or ten years; that she had not been in good health for several years; that she didn't see the accident, but was at the church; that she supposed there were about one hundred and fifty people present that day; that church services were over, most had left, but a few were in the church, when the accident happened: that she was in the church when the plaintiff was brought in.

J. Q. Brantley testified for the plaintiff that he knew
the plaintiff and was present at the accident; that the
congregation was dispersing, and the car was on this side
of the street coming in the usual way; that he had time
to cross and did cross; that the people were
crossing at that time and fixing to cross;
that the car attracted his attention and
he didn't get across much too soon; that he turned
around and saw Mrs. Pryor; that the car seemed to pass
her some little space before she fell and the car ran
over her; that he went over to assist in taking care of
her; that the car seemed far enough back for the motor-
man to stop the car, and it seemed to him he had time to
check the car, but that if Mrs. Pryor had been noticing
closely, or if she had been so she could hear well, she
could have escaped being run over; that he states that
upon the assumption that she was able to get away
quickly; that he didn't notice or recognize Mrs. Pryor till
after the car had run over her, but had passed her be-
tween the church yard and car track; that the car was
close enough then to attract his attention, as it caused
him to look around; that there was time from Mrs.
Pryor's position, from where I saw her before she
crossed, that there was time for a person in her physical
health and mind to have crossed; that he thinks Mrs.
Durham passed the same time he did; that he couldn't
say whether any considerable number of people had
crossed before he did; that some had crossed and some
had not; that there was a regular street crossing at the
corner of the church where the street car track passes;
that the congregation was usually very good, but the
church services were over and the congregation dispers-
ing; that when he passed Mrs. Pryor she was between the

Presbyterian church and the street car track; that the crossing is on Florida avenue, the Presbyterian church on this side, Mr. Krause's house on the opposite side; that he didn't know whether it was midway, or not, between the Presbyterian church and street car track that he passed Mrs. Pryor; that he was with Mr. Durham walking a little rapidly when he saw the car coming; that others crossed in front of him; that Mrs. Pryor was walking when he passed her, walking with her head down; that when he looked back the car struck her but he didn't look back specially for her; that he don't mean to say that there was sufficient time after Mrs. Pryor got on the track for the motorman to have stopped the car, not after she got on the track, but that there was sufficient time for her to pass when I passed her, if she had walked as I did, but if I had been as weak and feeble as Mrs. Pryor I would not have attempted to cross the track, because Mrs. Pryor is not as active as I am; that a reasonable and prudent man would not have attempted to cross unless he thought he could get across safely; that he started to stop himself; that the fact of it was, he didn't know whether the motorman attempted to stop the car, because when he got across and looked around the car was striking Mrs. Pryor; that he didn't think he had got quite over to the other side of the street when he turned around; but that he did look around somewhere between the track and the side walk; that it seemed to him Mrs. Pryor was just entering the track on that side of the car as it struck her; that he didn't hear her say anything after it occurred, unless some expression of grief; that he was attending church that day and was well acquainted with her, belonging to the same church, but she didn't do business with him; that you could see two or three blocks

up the street car track; that when he first saw her, that is when he was coming out of the church door, he thought the car was just about entering the street, the northern edge.

C. E. Parcell testified for the plaintiff that he was a contractor, architect and civil engineer; that he had worked for the Consumers Company as superintendent of construction; that he knew the plaintiff and was present at the accident; that he was on the car coming from Ybor City talking with James Roberts, the plumber; that after he crossed the South Florda Railroad track he noticed a number of people coming out of the Presbyterian church; that Mr. Roberts got up to get out on the north sidewalk; that after that he kept his eye on the people and in crossing the south side walk felt a slight jolt of the car in passing; that as they passed he saw some person lying on the ground, on the left hand side of the street coming this way; that some one remarked they had run over some one, and the reverse current was then on the car; that he hollowed to the motorman to stop the car the car being reversed; the rear step was opposite the person lying on the ground; that he stepped out over the person and asked them to move the car ahead so they could pick her up; that they carried her in the church; that it was a Consumers car, and the motormen were employed by the company; that he saw people on the right hand side of the car and on the side towards the church; that he didn't notice the decrease in the speed of the car; that he didn't feel it till the reverse current was put on and thought he would have felt the brakes; that he didn't notice this particular person till after she was struck, nor couldn't tell the particular place on the track till afterwards; that the first thing he no-

ticed was the jolt of the car, like striking a piece of
wood; that the car went about a half length after strik-
ing her, probably eighteen feet before it started to go
back, or fifteen feet; but that he didn't mean the current
was put on after they passed the woman; that Wuerpel
was superintendent of the company at the time he was
superintendent of construction; that he didn't intend to
enter into an explanation of electricity, in explaining
the explaining the difference between a car reversing and
the reverse current, because he knew nothing about it;
that when he spoke of the reverse current, he meant the
car started back; that when the motorman turns the re-
verse lever, it throwns the reverse lever to the dynamo, or
whatever you call it, and the car will turn back immedi-
ately, but that if a car is going this way for a car to im-
mediately turn back, instead of going almost the length
of the car before it turns back, depends largely on the
speed it is going before it turns back, and that he wasn't
paying attention to the speed of the car; that after the
reverse current was put on he didn't think the car would
go over five or six feet, but that it would take five or six
seconds to put the reverse current on; that he didn't
think the car was going much faster than a person  could
walk; that he was talking with Mr. Roberts previous to
getting to Zack street; that it was a closed car and he
knew nothing at all about the accident till after the jolt;
that he knew nothing about the accident; that he didn't
see the motorman at the time of the accident; that he
didn't see whether he put on his brakes or not, nor re-
verse current, because he didn't see the motorman, and
didn't even remember whether the gong was ringing;
that he was talking to Mr. Roberts; that he  didn't  see
the person on the track and didn't know it was a person

it run over; that the distance from the South Florida Railroad to the Presbyterian church was two hundred and ten feet, and you could see the people from there; that the accident occurred on the south side of Zack street.

Charley Bizzontz testified for the defendant that he worked in the Western Union office as a messenger; that he knew Mrs. Pryor when he saw her; that he was on car number ten and saw the accident on the fifth of March, 1896; that the church was on the left hand side and he was standing on the front platform; that she was coming across the track and she wasn't more than eight or ten feet from the car; that all the rest of the people stayed still and hollowed to her not to go across; but she kept right on with her umbrella over her head, and he could see her face; that the bell kept on ringing from the South Florida Railroad till it got there, and she didn't pay any attention to it; that the motorman reversed his car, hurt his little finger in doing so and the step caught her dress; that the motorman commenced ringing that gong at the South Florida Railroad crossing and kept on till he got to the church, just as hard as he could ring it, ringing the bell the whole of the square; that he saw the people coming out of the church and heard them tell her not to cross, but she didn't pay any attention to the people, she didn't look at the car, and had her umbrella up; that the umbrella was pointing towards the car; that she was coming this way towards the track; that she didn't stop till she kind of stepped back and the car struck her, just as she started to go across she stepped back, and the car struck her; that he was standing on the front platform; that the car was going three or four miles an hour, or just about a walk; just as soon as the

motorman saw she was going to get on the track he put on his brakes as hard as he could and reversed his car; that when he started to put on his brakes he was about fifteen feet away; that Mrs. Pryor was just stepping on the track when the car was about fifteen feet off, and just as the motorman put on the brakes and reversed his car she stepped back; but all the rest of the people stayed right back on the sidewalk except her; some men went across but I don't know who it was, but he was way over by Roberts' building when the car struck Mrs. Pryor; that the car was further down when he crossed; that he saw Mrs. Pryor coming away from the church and saw the whole transaction from beginning to end; that after the accident she would first say her own fault and then the motorman's; that the car was stopped as quick as it could be stopped; that no motorman could have stopped it any quicker; that he commenced ringing his bell when he was up by the South Florida crossing and kept ringing it all up Florida avenue, and that Mrs Pryor never looked at the car once; that he is thirteen years old, and has worked for the Western Union about three years; that he never worked for this or any other street car company; that he didn't know about street cars, and when the motorman put on his brakes and current it sent him over against the dash board; that Mr. Krause's residence is the other side of the street, and there I first saw Mrs. Pryor; she was looking at some kind of a book, looked to me like a Bible; that the people were coming out of the church and all of them says "look out, there comes the car," but she just kept on looking at the book with the umbrella over her face; that she was coming from the church when he first noticed her; when I first saw her the car was on the

other side of the street from where the church is now; the book in her hand was open, and he thought it was a Bible, but could only see a little of it; that she had the book in this hand and the umbrella was sort of pointing with the west; and all the people on the church steps was hollowing to her to look out, the car was coming; that there was a good many people in the crowd hollowing to her; that he only noticed one man across the street; that he was coming from Ybor and had just delivered a telegram to Manrara's factory; that the motorman turned his brake a nd reversed his car just as fast as he could when he was about fifteen feet away; that he was about as far as from here to her when the motorman commenced to turn on his brake; that he pulled the levers back, reversed his car and had the brakes on as tight as he could; that the car didn't run over her till it knocked her down; that the wheels passed over her and the car commenced to run back as soon as it stopped; that there must have been some sand on the track, and the wheels kind of slid first without turning; that she said it was her fault and then the fault of the motorman three or four times, and wanted somebody to tell her son and he went to get him; that she didn't complain any, but just talked about whose fault it was; that Mrs. Pryor walked slowly taking her time, and he could see the white pages of the book, and that she seemed to be reading it; that he didn't hear the motorman say anything, but he put on all the brake he could; that he didn't used to pay anything for riding on the cars but does now; that the Western Union buy the tickets and sell them to the boys; that the post he referred to is the post that holds the trolley wire.

24 S C

Julia Norris testified for the defendant that her name
was Julia Norris, living in Tampa, at the corner of
Eighth and Central avenues, had lived there about two
months, but was born here and lived all her life here;
that she was on the upstairs porch at the Krause resi-
dence at Zack street and Florida avenue, knew Mrs.
Pryor and saw the accident on the fifth of March, 1896,
and saw the people coming out of the church; that the
ringing of the bell of the street car attracted her atten-
tion; that when she first saw Mrs. Pryor she was within a
few feet of the street car track, about five or six feet and
the car was about the middle of the street; that the next
thing she saw was when the car had passed over her,
because she didn't happen to be looking at the car at the
time it struck her; that the car being between them she
could see the motorman, but the car was reversed so
quickly that she thought the car had run over Mrs. Pryor
again; that they carried her into the church; that a gen-
tleman at the corner of Mr. Roberts' store motioned to
her not to go on the track, but she didn't pay any atten-
tion to it, and kept right on coming into the track; that
witness heard the bell of the car ringing even before she
saw the car, and saw the car stop so quickly that she
thought it was going to run over Mrs. Pryor again; that
the car was going slowly and one gentleman had got over
by the corner store; that she didn't see her as she stepped
on the track, the car was in the middle of the street and
a man motioning for her to stop before she got to the
track, but I was at Mr. Krause's the opposite side of the
street and couldn't say who the gentleman was, but he
motioned to her and she was coming towards the track;
witness was first looking at Mrs. Pryor when this man
motioned when she was about five or six feet from the

track, walking towards it; that Mrs. Pryor was on the
south side of Zack street, and that the car had slowed up
for some gentleman to get off, just before it got to where
she was; that he got off while the car was in motion on
the west side; that Mrs. Pryor was looking straight
ahead with an umbrella in her hand.

Rosa L. Krause testified for the defendant that her
name was Rosa L. Krause, living at the corner of Zack
street and Florida avenue since she was born; that she
was also in the piazza and saw the accident to Mrs.
Pryor on the fifth day of March, 1896; that when witness
first saw Mrs. Pryor, she was walking towards the
street car but does not know which way she was looking,
and the car was only ten feet away from her, from Mrs.
Pryor, when witness first saw it, that the bill distinctly
rung, a man motioned to Mrs. Pryor, but she stepped on
the track, tried to step back too late, and the next thing
she was laying on the ground and they picked her up and
carried her into the church; that witness was on  this
side, so when the car and her came together she could not
see her; that Mrs. Pryor stepped one step across the rail,
the gong was ringing and she was the only one coming
across there; that Mrs Prior made no effort to stop and
wait for the car to pass until she got on the track itself;
that she does not remember how fast the car was coming,
but there was a gentleman to get off at the corner and
the car was slackening up, and saw the gentleman get
off, Mr. Roberts; that he got off on the sidewalk next to
his store, but don't remember whether he got off the back
or front end; that Mrs. Norris was with her on the upper
piazza on the northwest corner of Zack street and Florida
avenue; when she first saw her the car was very near
Mrs. Pryor, and she had just put one foot across the first
rail; the gentleman on the other side of the track mo-

tioned to her, but don't know who he was; that she knew
J. Q. Brantley and L. E. Durham but didn't see them;
that Mrs. Pryor kind of hesitated when she crossed the
first rail but stepped back too late, that she stepped
right back; that she didn't see the motorman because
he was in front of the car; that the car started back but
didn't run over Mrs. Pryor again, and didn't hear any-
thing said before the car struck her.

James W. Roberts testified for the defendant that he
knew Mrs. Pryor when he saw her, and was present at the
accident to her on the fifth of March, 1896; that he
was coming from Ybor City to his store on the corner of
Zack street and Florida avenue; that he was on the car
and walked to the back steps to get off; that he usually
motioned to the conductor to slow down, but the car was
going unusually slow, and he didn't motion this time;
that he saw a lady by the crossing as he was going to
jump off and he jumped off on this side and Mrs. Pryor
was under the edge of the car, and the car went about two
feet from the crossing, and started back; that he thinks
the car was reversed; that he got off without any trouble
at all and was probably talking to Parcell coming down;
that Parcell didn't get off when he did; that when he
first saw Mrs. Pryor she was on the ground, after she was
struck; that he with some others put their shoulders
there to keep the car from running back after it was re-
versed, but the car did not run over her coming back;
that he remembers jumping off on the sidewalk; that the
car was running very slowly; that he often got off the
car without them stopping it; that the car was running
about an ordinary man's walk; that he thought he saw
two people who had crossed, one was Mr. Brantley; that
the car had run the whole length of the block slow, and

didn't take the usual speed; that witness noticed that and that is the reason he didn't notify the conductor.

Harry Hawse testified for the defendant that he was present at the accident on the closed car about a year ago; that he was standing in front with the motorman with his feet on the dashboard; that when they got to the railroad crossing all the people were coming out of the church and the motorman was going slow and ringing his bell; that when the motorman got along there all the people stopped and the track was clear and when very near this Mrs. Pryor started to cross and immediately he saw she was going to cross he reversed his car, and put the brakes on, but he could not stop it in time, and it caught her dress and knocked her down, and the last I saw, I think it run over her foot; that as soon as this occurred he went on to the Consumers office; that he was standing on the front steps with side next to the church on the car, on the side Mrs. Pryor was struck; that no one was on the track and the track was clear, and as soon as Mrs. Pryor started to go on the track, the motorman reversed the current; that he reversed his car when she had first stepped over the rail; that he knocked all the skin off his hand in reversing it, and had it reversed so that it started back; that the motorman started to stop that car as soon as she got on the track; that when she had just stepped on the track somebody hollowed to her; that she was looking up towards Franklin street as she was coming towards the track, and not looking towards the car because she had an umbrella over her, and was looking straight ahead; that she had just stepped over the rail when the car got to her, just as the car got there, just instantaneous; that he didn't hear her say anything to the motorman and was looking right at her; that she

just came towards the car and paid no attention to it;
that he was fourteen years old and working for T. M.
Bush & Company at that time; that Mr. Paramore asked
him to go to the Consumers office and report; that when
he first saw Mrs. Pryor she was coming down the steps,
but the balance of the people were just standing there,
and the car was about as far as from here over yonder
(witness pointing to object); that you could see down
the street, and when he first noticed the people the car
was at the South Florida crossing, Polk street, one block
away; that when Mrs. Pryor first got to the railroad
track the car was about ten or twelve feet away; that the
car was running about as fast as an ordinary person
walks, or a little faster; that he supposed the church
steps from the railroad track were about as far as from
him to a post in the court room (pointing out object);
that there was nothing special to attract his attention
to this lady but when he first saw her she was coming
down the church steps; that the motorman had the usual
brake on his car and put it on and the reverse lever; that
he pulls the lever with one hand and turns the brake with
the other; that the car ran about as far as from him to a
table in the court room (which witness pointed out) after
he put on his reverse lever; that the two front wheels ran
over her but the car didn't go beyond her; that he got
right off, didn't go into the church, heard them hollow
to her, but didn't hear her say anything; that he was
holding on tight, so he wasn't thrown off by the jerk
when the motorman stopped his car; that when the mo-
torman put on his brake and tried to stop his car he was
only a few feet from her, when she had just stepped on
the track in front of the car; that by the time he re-
versed his car he was on her; that she had had an um-

brella in her hand and nothing else that he noticed .

J. A. Williams testified for the defendant that he was transfer agent for the Consumers Company, but a motorman by occupation; that he had been in the employ of the Consumers Company about three years; that he judged that was Mrs. Pryor sitting there and that he was present at the accident which occurred on the fifth of March, 1896; that he was on the car coming to dinner as a passenger and noticed the people coming out of the church from the South Florida railroad crossing till they got there; that they had crossed the track except her and a few others, but that when the car got to within fifteen feet of her she started to cross, and some lady on the other side motioned her to stop, but she had an umbrella in her hand and didn't see them; and when the car was within fifteen feet of her she stepped right in the middle of the track and the car struck her; that he and Parcell were the first to get to her; that the motorman put on his brake and reversed his car, but one wheel went over her; that she wasn't looking at the car as it was coming down the track or paying any attention to it, and had an umbrella over her, and that she stated in his presence, that "if it hadn't been for the umbrella it would not have happened;" that he heard her say that if it hadn't been for the umbrella she would have seen it; that the car was going very slow and the bell ringing, so that it attracted his attention; that Paramore was the motorman; that she deliberately stepped right in the middle of the track about fifteen feet in front of the car; that the motorman immediately put on his brake and reversed the car; that he could not have acted any quicker than he did, and that the accident could not have been avoided, and that the car was stopped as quick as it could be and that every-

thing was done that could be done to stop the car; that it is quicker to stop a car to put on the reverse current (as the motorman did) than the brake; that it does not take long to reverse the car, you having the controller and the handle you put the current on; that the reverse current is controlled by a lever; that you simply reverse that lever and that quick (snapping his fingers) it is done; that the car was stopped suddenly; that he had been a motorman, was not now, and had been a motorman about two years and a half; that the car was midway of the street, and he didn't know exactly how wide the streets were, when she was coming across the street, but when she stepped on the track the car was only fifteen feet from her, or fourteen, and he reversed his car; after a motorman gets his car reversed, it can stop in twenty feet, if he could get it reversed sooner, it would stop sooner; that you stop the car by turning the lever from one side to the other once; move the lever with one hand and brakes with the other in five seconds; that both levers on one side have to be used with same hand, brake with the other; that you turn the reverse lever and the controller and that constitutes a reverse; that it would take him about a quarter of a minute to do that, and then, after he gets it reversed, going that slow, it ought to stop within (after he gets it reversed) about six feet; that quite a lot of people were still inside of the church when they carried the lady in; that when he first noticed this lady she stopped and turned back and spoke to someone, but had an umbrella over her and wheeled right around and started across that track, and that the car was so that she could have got across then; that she seemed like she was frightened, but the persons on the other side of the street were motioning to her and hollow-

ing to her; that she kind of turned back and the car struck her; that he was inside the car with eight or ten people; that there was a motorman and conductor, anu the conductor's name was Jones; that when that woman started to cross that track the car was about fourteen feet from her; that when the car was about half way the persons hollowed to her to look out; but that she deliber; ately started to cross, and the motorman immediately reversed his car, and that he had never seen a car stopped so quickly as that car was stopped; that he thinks there is a sidewalk on the other side of Zack street; that when Mrs. Pryor started to cross that track the car was not more than fourteen feet from her; that he didn't mean to say that the car was midway between the sidewalks, but that it had crossed over the road crossing; that if she had been attentive she could have got over, because she had only to take a step; that the rear of the car was about the middle of the street, and the rear of the car might have been forty feet from Mrs. Pryor; that he didn't know what the length of the car was, but if Mrs. Pryor had not stopped she could have got over; that it was reasonable to suppose she was going to cross the track when she started that she said if it hadn't been for the umbrella she could have seen the car; that he didn't see her foot at all, but came right down to the office and reported and looked for a doctor.

E. W. Paramore testified for the defendant that he lived in Tampa, and worked in the Fire Department; that he had been a motorman two years and a half, eight months in Texas and about a year and a half with the Consumers Company prior to the accident to Mrs. Pryor on the fifth of March, 1896; that as he got to the Polk street crossing one block away, he noticed several people

coming out of the Presbyterian church and began ringing his bell, and slowed up the car; that when he was within ten or twelve feet of the crossing a lady stepped out and stepped right on the track, and he immediately applied his brakes and reversed the car; that she stopped on the track about ten or twelve feet from the car; that he saw her coming up and thought she would cross over; that when she stopped he · immediately applied the brakes and reversed the car and the car could not have been stopped any quicker than it was; that it would not have stopped any quicker unless it had been run against a log; that the brakes and current were in good condition and the current was all right; that he applied the brakes and put on the reverse current and the car stopped instantly; that the side of the car towards the Presbyterian church struck her; that by the time he got the car stopped they were picking her up; that he thought they were at about the back steps of the car and that he had never before had an accident; that there were people coming out of the church when he first saw this lady standing among them but didn't take particular notice of her, there may have been forty or fifty; that some were standing and talking waiting for the car to pass, and some had crossed over; that some of them crossed the track a half block ahead of him; that when Mrs. Pryor first stepped on the track she was ten or twelve feet away from him; that the car was not over in the center of Zack street, but only ten or twelve feet away; that she seemed to see the car and stopped right still; that the car was stopped as quick as possible; that he stated at the city hall afterwards that those brakes were in fair condition and he reversed the car also; that the car ought not to have been stopped within ten feet but could be stopped in twenty; of

The Con. Elec. L. & St. R. R. Co. v. Pryor.—Opinion of Court.

course, having reversed the car, it started back till the reverse current was shut off; that he didn't run her again; that the current was as good as it ever was; that the appliances and current were all right; that he left the street car company about the first of February, because he was laid off indefinitely, and went to the office and got his money; that he couldn't tell how many ladies were on the church side and how many had crossed over; that the quickest way to stop a car is to reverse it instead of putting on the brakes; that as a usual thing they do put on the brakes, but that that car on that day, on that track could not have been stopped any quicker by any application that you ever heard of; that he hurt his hand by the reverse lever of the controller, the controller handle being on top, when he reached for the lever he struck his hand; that he put on the brakes and reverse current and the wheels were in a backward motion, slipping on the track; that there was time for the lady to have crossed if she had not stopped; that the current turned the wheels backward when he stopped and reversed the car; that if he had had the brakes on tight enough to have blocked the wheels, it would have prevented it stopping as quick, as the wheels going the other way.

Other facts necessary to be referred to will appear in the opinion.

*P. O. Knight,* for Plaintiff in Error.

*Wall & Stevens,* for Defendant in Error.

MABRY, J. (*after stating the facts.*)

This case was referred by the court to its commissioners, a majority of whom report in favor of affirming the judgment. A majority of the court is of that opinion.

In view of the existence of a difference of opinion as to the result both among members of the court and the commission, it is deemed advisable, contrary to the usual custom of the court in cases of affirmance, to file a written opinion.

One of the errors assigned and insisted on is that the court erred in overruling the demurrer to the amended declaration, exhibited by the abstract and shown by the statement. Several general propositions of law are stated as grounds of the demurrer that have no special application to the allegations of the declaration, and are out of place.

Counsel for plaintiff in error argues that the declaration is defective in its failure to sufficiently allege negligence on the part of the defendant company in causing the injury, and there are specific grounds of the demurrer that present the objection urged. The rule established by this court, in actions where negligence is the basis of recovery, is that it is not necessary for the declaration to set out the facts constituting the negligence, but an allegation of sufficient acts causing the injury, coupled with an averment that they were negligently and carelessly done, will be sufficient. Walsh v. Western Ry. Co. of Florida, 34 Fla. 1, 15 South. Rep. 686; Jacksonville, T. & K. W. Ry. Co. v. Jones, 34 Fla. 286, 15 South. Rep. 924; Jacksonville, T. & K. W. Ry. Co. v. Garrison, 30 Fla. 557, 11 South. Rep. 929. The declaration in this case is not based upon the theory of this simple rule of pleading, but it proceeds to set forth certain acts which are relied on as constituting a cause of action without alleging in terms that they were negligently done. After stating that the defendant company owned and operated a street railroad upon a certain highway or street in the

city of Tampa, and drove a certain street car upon said highway up to and across another named street crossing, it is alleged that it was the duty of defendant to so run and operate its said street railroad as not to endanger persons or vehicles traveling upon or across any of the streets of the said city upon which said street railroad was operated, and when necessary for the protection of persons and vehicles traveling upon or across any of said streets to stop the same. Other facts are stated showing acts on the part of defendant resulting in injury to the plaintiff caused by the running of a certain street car which must be considered, though they are not in terms alleged, to have been negligently done. The mere allegation of a duty without sufficient facts to support it wil not be sufficient. It must appear from the direct averments of the declaration that the acts of the defendant causing the injury were negligently done, or, as is attempted by the declaration before us, it must appear from a statement of such facts as certainly raise the presumption that the injury was the result of defendant's negligence. Seymour v. Maddox, 16 Ad. & El. N. S. (Queen's Bench) 326; Angus v. Lee, 40 Ill. App. 304; Pennsylvania Co. v. Marion, 104 Ind. 239, 3 N. E. Rep. 874. Do the facts alleged meet this requirement? The act of 1891, defining the liability of railroad companies in certain cases (Chapter 4071, Appendix R. S. p. 1008), has been regarded by this court in unwritten opinions as applicable to street railroads, but it has not been considered as changing the rule of alleging negligence in such cases to the extent of requiring only an allegation of injury or damage by the running of locomotives, cars or other machinery of the defendant company. The statute does not undertake to fix arbitrarily liability for an

382    SUPREME COURT.    [44th Fla.

The Con. Elec. L. & St. R. R. Co. v. Pryor.—Opinion of Court.

injury done, but there is a presumption of negligence under it arising from the injury or damage.

An act in 1887 made the killing of stock by a railroad company *prima facie* evidence of negligence, and it was said in Jacksonville, T. & K. W. Ry. Co. v. Garrison, *supra*, that it operated upon the remedy and did not change the basis of liability in such cases; that negligence was the basis of the action and must still be alleged in the declaration. And in the case of Wilkinson v. Pensacola & A. R. Co., 35 Fla. 82, 17 South. Rep. 71, which was an action for personal injury under Chapter 3744, act of 1887, it was held that negligence was the basis of the action and that the statute did not relieve the plaintiff from alleging it. If the pleader, however, departs from the rule of stating sufficient acts and alleging that they were negligently done, and undertakes to state facts that certainly show a duty unperformed from which injury results, the rule of liability recognized by the statute in cases coming under it should be kept in mind in determining the sufficiency of the facts. The first section of the act provides that "a railroad company shall be liable for any damage done to persons, stock or other property, by the running of the locomotives, or cars, or other machinery of such company, or for damage done by any person in the employment and service of such company, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company." The second section contains the provision that if the complainant and the agents of the company are both at fault, the former may recover, but the damages shall be diminished or increased by the jury in proportion to the amount of default attributable to him.

The words in this statute, "all ordinary and reasonable care and diligence," are relative terms. It was held in the case of Morris v. Florida Cent. & P. R. Co., 43 Fla. 10, 29 South. Rep. 541, that under the provisions of the section quoted what will constitute the amount or kind of diligence that will be required as "ordinary and reasonable" must necessarily vary under different circumstances. It can not be measured or ascertained by any fixed and inflexible standard, because the words are themselves relative terms, and what, under some conditions, would be ordinarily and reasonable diligence, might under other conditions amount to even gross negligence.

The doctrine, based upon principle and the great weight of authority, is that street cars, regardless of the power by which they are impelled, have no superior rights to other vehicles or pedestrians at regular crossings, but their respective rights are simply equal. In the absence of a specific grant to that effect it must not be presumed that the State has given a street railroad company any exclusive right to a highway. The use of rails and cars in a street is considered only as a more convenient way of using the street without imposing any new burdens upon it. State ex rel. v. Jacksonville Street R. R. Co., 29 Fla. 590, 10 South. Rep. 590. Pedestrians must cross at street crossings or cease to walk the streets, and they have the right to the ordinary use of the same; and likewise an authorized street car company must use the street in order to carry passengers, and it has the right to propel cars over its tracks in the street. The rights of both are equal and in common, and impose certain correlative duties which must be observed by each party. All ordinary and reasonable care is the measure of duty im-

posed, and it means care proportionate to the danger to be avoided. It will vary, of course, according to the circumstances and the exigencies of the situation, in view of the relationship of the parties, as held in Morris v. Florida Cent. & P. R. Co., *supra*, and must be such as may reasonably be expected of persons of ordinary prudence under like circumstances. A railroad company having the right to operate its tracks can not from the nature of its construction deviate therefrom as persons can, and hence it is the duty of a pedestrian in approaching the track to use ordinary and reasonable care to ascertain the approach of cars and to avoid injury therefrom. The employes of the company in control of a car have the right to presume that a pedestrian will exercise such care and are not required to stop the car until it becomes evident to a person of ordinary and reasonable care and prudence that the pedestrian has failed in his duty, and has placed, or is about to place, himself in a perilous situation. The duty, however, devolves upon the company's employes to keep a vigilant lookout for persons on or approaching the track, especially at street crossings, and when they are discovered to be in danger or going into danger on the track to use every effort consistent with the safety of passengers to avoid injuring such persons. 2 Shearman & Redfield on Negligence (5th ed.) section 485a; Booth on Street Railways, section 304; Bunyan v. Citizens' Railway Co., 127 Mo. 12, 29 S. W. Rep. 842

In addition to the allegations of the declaration stated above, it is further averred that the plaintiff with numerous persons, constituting a large crowd that had just come out of the church situated near the intersection of Florida avenue and Zack street, was crossing said

avenue and the track of defendant's street railroad at a regular crossing thereof while one of defendant's cars was approaching said crossing, and that the conductor and motorman of the car was at such a point on said avenue that they could see the crowd crossing the track at least two hundred feet from said crossing  This is sufficient to show that the employes of the defendant could have seen, and therefore it was their duty to see, plaintiff and the crowd of people in a situation of danger by approaching and going across the track in front of the car at a regular street crossing, and it then became the duty of the employes to use every effort consistent with the safety of passengers to avoid injuring plaintiff or the crowd of people. · Conceding that the car could have approached the crossing under the assumption that plaintiff and the crowd would leave the track, still the presence of human beings thereon and the apparent situation of danger to them, imposed upon the agents of the company the duty to so approach the crowd as to avoid injury if possible, even to the stopping of the car if necessary.  The company has no right, of course, to run into a crowd of people though they disregard their duty and do not leave the track.

It is alleged that at the time plaintiff was struck by the car she was crossing the track at a regular crossing with all due care and diligence, and this is inconsistent with the view that the agents of defendant were at the time exercising a like care and diligence in running the car against her.  The distance at which plaintiff and the crowd could have been seen on the track excludes the idea that the employes could not have avoided a collision by the exercise of ordinary and reasonable care and

25 S C

diligence, and they were under such duty in view of the alleged conditions and attending circumstances. The declaration clearly shows that defendant injured plaitiff by the act of running a car against her on a regular street crossing where she was passing with all the due care and diligence, and it also shows, we think, fault on part of defendant under the circumstances stated in running the car against her.

It is alleged that in consequence of the default and neglect of the employes of defendant in not stopping the car it ran against and struck plaintiff. Under our system of pleading, special demurrers are abolished and mere indefiniteness can only be reached by motion. We are inclined to hold that in substance the declaration alleges enough to show liability on part of defendant, and that the demurrer was rightfully overruled on the objection urged.

The grounds of the motion to strike out the second, third and fourth pleas are not stated in the abstract, nor is there anything shown in the order of the court striking out the pleas to indicate the basis of the ruling. It is admitted in the brief of counsel that the ruling of the cuort may be regarded as harmless so far as defendant is concerned, as its entire defense was permitted under the plea upon which was joined and the trial was had. We are of opinion that the pleas, so far as they attempt to set up a defense to the action, amounted to the general issue, and were properly stricken out on motion. Little v. Bradley, decided at this term. The fourth plea is an argumentative denial of liability on the part of defendant and seeks to set up the same defense as the others.

The court gave several charges at the request of counsel for plaintiff, and some of them were excepted to in a

motion for a new trial and have been assigned as error, but counsel has expressly abandoned these assignments in the argument here.

The court refused to give eight of the numerous requests to charge made by counsel for the defendant, and the refusals are properly assigned for error. The assignment on the refusal to give the first refused request is abandoned in the argument, and the second of the rejected requests was properly refused because it is erroneous. It is as follows: the plaintiff can not recover unless the motorman of the car, after becoming aware of the danger of plaintiff, by the exercise of reasonable care and prudence could have prevented the accident. This instruction seeks to limit the duty of defendant's employe to avoid the injury to the time when he became aware of plaintiff's danger without reference to whether he had observed all ordinary and reasonable care before that time to discover the dangerous situation of plaintiff. It is not error to refuse a request that ignores the duty of the company's servant in that respect.

We have examined the other six requests refused and find no error in their refusal on the abstracts submitted. Some of them contain statements of law that are not correct, and portions of some are fully covered by the charges given to the jury. The facts hypothesied as "a basis for these charges are very meager and amount to no more as a statement of facts than that when the street car was approaching the crossing the plaintiff was also going towards the track. Upon this showing it does not appear that the court erred in declining to give the requests, independent of other objections that might be urged against them.

The only other assignment of error to be considered is that the court erred in overruling the motion for a new

trial on the ground that the verdict was not supported by the evidence. The statement gives that part of the testimony bearing on the liability of the company for the injury, and after a careful examination of it we are inclined to hold that the court did not err in overruling the motion. That the plaintiff was guilty of contributory negligence is shown by the evidence, but this alone does not debar her of a recovery under the statute if the employes of the company were also at fault in proximately causing the injury. There was a presumption under the statute against the exercise of ordinary and reasonable care on the part of the company in consequence of the damage that had to be overcome. The testimony of some of the witnesses introduced by the defendant, notably that of the motorman Paramore and the transfer agent Williams, exonerated the company from any blame, but there was other testimony tending to show a failure to exercise ordinary and reasonable care on the part of the employes under the circumstances. That the employes saw, or could have seen by the exercise of ordinary care, for a distance of two hundred feet in front of the car a crowd of people coming out of the church and crossing the car track at a regular street crossing is sufficiently shown by the evidence. There is also evidence tending to show that when the car was forty or fifty feet away from the crossing, the plaintiff who came out of the church and was in the crowd could have been seen approaching the track without observing the car, with an umbrella between her and the car. One of the witnesses for the defendant, who was standing by the motorman, says that while the bell kept ringing and people hollowed to plaintiff to stop, she paid no attention to it but kept right on with her umbrella over her head between her and

the car, and that she was looking at a book with the umbrella over her face. This witness does say that plaintiff walked onto the track a short distance, ten or fifteen feet in front of the car, but there is other evidence tending to show that when plaintiff reached the track with her umbrella over her the car was forty or fifty feet away. She says herself that when she got to the track and then first saw the car it was forty or fifty feet away. Julia Norris says that when she first saw plaintiff she was about five or six feet of the car track, and the car was about the middle of the street. The exact width of the street is not given, thought it is clearly inferable from other testimony that the middle of the street was forty or fifty feet from the crossing. The motorman admits that the car might have been stopped in twenty feet, but he says the car was only ten or twelve feet from plaintiff, and not in the middle of the street when she stepped out on the track. There is a conflict in the evidence on this point. There is evidence to show that plaintiff had an umbrella over her head and was warned of the approach of the car of which she seemed to be oblivious at the time. This condition was observed by persons on the car, and it may be assumed that the motorman was aware of it. It was his duty to see it if he did not. It is clearly shown that he saw the crowd come out of the church, and it appears that there was crossing of the track up to the approach of the car. One witness says he did not get over any too quick. In view of the crowd in proximity to and on the track the motorman should have had the car under such control as to avoid the injury if it could have been done by the exercise of ordinary care. If the plaintiff was discovered or could have been discovered by reasonable care, in a perilous situation, the employes should have

avoided injuring her if they could have done so. On this point we think there is room for difference of opinion among fair minded men and was proper for the consideration of the jury. As said by Judge Cooley in Detroit and Milwaukee R. R. Co. v. Van Steinburg, 17 Mich. 99, "when the question arises upon a state of facts on which reasonable men may fairly arrive at different conclusions, the fact of negligence can not be determined until one or the other of those conclusions has been drawn by the jury. The inferences to be drawn from the evidence must either be certain and incontrovertible, or they can not be decided upon by the court. Negligence can not be conclusively established by a state of facts upon which fair minded men may well differ." The same view is announced in Boss v. Providence & W. R. Co, 15 R. I. 149, 1 Atl. Rep. 9, as well as in other cases. See, also Cooke. v. Baltimore Traction Co., 80 Md. 551, 31 Alt. 327, where it was held that where the nature of the act relied on to show negligence contributing to the injury can only be determined by considering all the circumstances surrounding the transaction, it should be passed upon by the jury, and it is not for the court to determine its quality as matter of law.

Without further special comment on the evidence we think it is of such a character as to render it beyond our think it is of such a character as to render it beyond uor province, after being approved by the trial judge, to declare it insufficient to sustain the verdict. The judgment must, therefore, be affirmed, and it is so ordered.

TAYLOR, C. J. (Dissenting.)

I can not agree to the conclusion reached by the majority of the court upon the sufficiency of the evidence to support the verdict found in this case. My view is that in order to hold the street car company liable for the injuries sustained by the plaintiff below, it was necessary that the railway company should have been guilty of some negligence that was the proximate cause of the injury. The proofs, in my judgment, without any conflict, therein, show that the agents of the railway company on the occasion of the injury used every reasonable care and diligence with which they were charged in law and were not guilty of any negligence that would affix liability upon it for the accident, and that it was brought about wholly by the unaccountable negligence of the plaintiff below, who, from the proofs, seemed to have acted in total obliviousness of the plainest dictates of self preservation. To hold the railway company liable, under the facts proved in this case, is, in my judgment, in effect constituting such companies unconditional insurerers of the public against injury by the instrumentality of their appliances.